_____

|  | ) |  |
| --- | --- | --- |
| **I.V.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 16-11167-DJC** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                              **August 8, 2017**

## I.      Introduction

The mother of Plaintiff I.V. filed a claim for supplemental security income ("SSI") with the Social Security Administration ("SSA") on behalf of I.V.  R. at 174.[1]  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), I.V. brought this action for judicial review of the final decision of Nancy A. Berryhill,[2] Acting Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on January 23, 2015, denying her claim.  D. 14.  Before the Court are I.V.'s motion to remand, D. 14, and the

---

[1] "R." refers to citations to the administrative record, D. 13.

[2] Nancy A. Berryhill is now the Acting Commissioner of Social Security, and is substituted for Carolyn W. Colvin in the caption for this case.  D. 20.

Commissioner's motion to affirm the ALJ's decision, D. 18.  For the reasons explained below, the Court DENIES the Commissioner's motion to affirm and ALLOWS I.V.'s motion to remand.

## II.     Factual Background

I.V. was born on June 15, 1997, and she was an adolescent when the application was filed on June 15, 2012.  R. at 19.  Her alleged disability onset date was May 1, 2009.  R. at 174.  I.V. alleged Type 1 Juvenile Diabetes, Depression and related conditions.  R. at 196; D. 1 at 1.

## III.     Procedural Background

I.V. filed her application for SSI benefits on June 15, 2012.  R. 19.  After initial review, the SSA denied her claims on August 17, 2012.  R. at 101.  Upon reconsideration, the SSA again denied her claims on April 9, 2013.  R. at 105.  On May 16, 2013, I.V. filed a timely request for a hearing before an ALJ.  R. at 108.  A hearing was held before the ALJ on January 30, 2014.  R. at 41-47.  A second ALJ hearing was held on October 28, 2014.  R. at 48-77.  In a written decision, dated January 23, 2015, the ALJ found that I.V. was not disabled within the definitions of the Social Security Act and denied her claims.  R. at 16-35.  On April 21, 2016, the Appeals Council denied a request to review I.V.'s claim, rendering the ALJ's decision the Commissioner's final decision.  R. at 1-5.

## IV.     Discussion

### A.     **Legal Standards**

#### 1.     *Standard for Entitlement to Social Security Disability Insurance Benefits and Supplemental Security Income*

Social Security regulations set out a three-step evaluation to determine whether a child under the age of 18 is disabled within the meaning of Title XVI of the Act.  20 C.F.R. § 416.924(a).  All three steps are not applied to every applicant; the determination may be concluded at any step of the process.  See id.  At the first step, if the child is engaged in gainful activity, the child is not

disabled. 20 C.F.R. § 416.924(b). At the second step, if the child does not possess a severe medically determinable impairment or combination of impairments, the child is not disabled. 20 C.F.R. § 416.924(c). At the third step, the child's impairment or combination of impairments must meet, medically equal, or functionally equal any of the listings set forth in the disability regulations at 20 C.F.R. § 404, Subpart P, Appendix 1 ("Appendix 1") for the child to be found disabled. 20 C.F.R. §§ 416.924(d), 416.925(a).

An impairment or combination of impairments meets a listing in Appendix 1 if the objective medical and other findings satisfy the specific criteria set forth in the listing, and is expected to result in death or last for at least twelve continuous months. 20 C.F.R. § 416.925(c)(3). An impairment or combination of impairments medically equals a listing if "it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

A child's impairment or combination of impairments functionally equals a listing if the impairment rises to "listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six domains of functioning ("domain" or "domains") concern the child's age-appropriate functioning in: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and manipulating objects; 5) caring for himself; and 6) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)-(vi).

In assessing whether the child has a "marked" or "extreme" limitation, the ALJ must consider the functional limitations from all medically determinable impairments, including impairments that are not severe. Id. The regulations define a "marked limitation" in a domain as one that "interferes seriously" with a child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme limitation" in a domain is one that is more

than marked and interferes "very seriously" with a child's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

2. *Standard of Review*

The Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner. See 42 U.S.C. §§ 405(g), 1383(c)(3). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. See Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the Court, to determine issues of credibility, resolve conflicts in the evidence and draw conclusions from such evidence. See id.

The ALJ's findings of fact, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

B.    **Before the ALJ**

1.    *Medical History*

a)    Type 1 Diabetes Mellitus

In May 2009, then 11 year-old I.V. was diagnosed with Type 1 diabetes mellitus.  R. at 270.  Over time since that diagnosis, doctors have suspected that I.V. was not receiving all insulin as prescribed.  Id.  I.V.'s mother and I.V., however, denied this possibility.  See, e.g., id.; R. at 678, 711.  Generally, I.V.'s mother or the school nurse gave her insulin injections in both the upper and lower extremities and on the anterior abdominal wall.  R. at 678.  I.V. also gave herself some doses under supervision.  Id.  I.V.'s insulin dosage has been revised numerous times.  See, e.g., R. at 661, 672, 686.

In July 2011, I.V. went to Boston Children's Hospital's ("Children's") Emergency Department due to vomiting and large ketones in urine, R. at 618, but her lab results were consistent with acidosis, R. at 621.

In September 2011, she was admitted to the intensive care unit ("ICU") at Children's for diabetic ketoacidosis ("DKA") due to an acute onset of vomiting and some abdominal pain.  R. at 614, 617.  I.V. denied missing any insulin doses.  R. at 614.

In October 2011, I.V.'s insulin dosage was increased because I.V. reported hyperglycemia in the afternoon.  R. at 672.

In December 2011, I.V. was admitted to Children's from DKA due to vomiting and hyperglycemia.  R. at 611.  Dr. Amy Levenson wrote that it was possible that there was an omission of insulin over the past few days and inadequate administration of insulin once I.V. became ill that led to I.V. developing DKA.  R. at 722.

On April 12, 2012, Dr. Joseph Wolfsdorf wrote that I.V.'s insulin dose had significantly increased.  R. at 658.  He encouraged I.V. to consider switching to an insulin pump and discussed the possibility of using Lantus or Levemir insulin as alternatives to NPH insulin.  Id.  Eight days later, on April 20, 2012, I.V. was admitted to Children's due to abdominal pain, vomiting, hyperglycemia and ketones in her blood.  R. at 607.  As a result of her persistently high glucose and ketonemia, which may have represented an adequate insulin administration at home, R. at 609, Dr. Elizabeth Hart and Dr. Sanjeev Mehta adjusted I.V.'s insulin regimen to long-acting insulin at lunchtime to be given under nursing supervision.  R. at 718.

In August 2012, Dr. Subbiah Doraiswami, an advising physician to the Disability Determination Service ("DDS"), assessed I.V. for her diabetes impairment and found that I.V. would have a "less than marked" limitation in the domains of acquiring and using information and attending and completing tasks as well as a "marked" limitation in the domain of interacting and relating with others with no limitations in the remaining domains.  R. at 78-85.

In November 2012, I.V. was admitted to Children's for DKA due to abdominal pain, nausea and vomiting.  R. at 617, 711.  Dr. David T. Breault agreed with Dr. Jonathan Swartz that "insulin omission is the most likely etiology of her DKA."  R. at 713, 714.  I.V. elected begin to take Lantus at 9:00 p.m. so that her mother could administer it to her.  R. at 714.  Later that month, I.V. and her mother discussed insulin pump therapy with Jennifer Rein, a licensed independent clinical social worker, at Children's.  R. at 831.  Rein thought that I.V. "could be a candidate for insulin pump therapy but that it may be best to work on improving basic diabetes skills and further decrease [I.V.'s] HbA1c before seriously considering transitioning to the pump."  Id.

In January 2013, I.V. was admitted to Children's for DKA due to abdominal pain, nausea and vomiting.  R. at 596.  Dr. Ian Zenlea wrote that "given the pattern of repeated admissions due

to hyperglycemia and DKA without clear etiologies, we strongly suspect, insulin, specifically Lantus, omission." R. at 708. Dr. Lisa Swartz Topor agreed that "insulin omission is the most likely etiology for today's episode of DKA." R. at 710.

In April 2013, I.V. was admitted to Children's due to body aches and abdominal pain. R. at 522. Due to the risk for DKA, I.V. was sent for further evaluation, hydration and insulin administration to Children's Emergency Department. Id. On April 4, 2013, Dr. John Jao, an advising physician to the DDS, assessed I.V. for her diabetes impairment and found that I.V. would have a "less than marked" limitation in the domains of acquiring and using information, attending and completing tasks, and health and physical well-being, as well as a "marked" limitation in the domain of interacting and relating with others with no limitations in the remaining domains. R. at 89-97.

In August 2013, I.V. was admitted to Children's for DKA due to abdominal pain, vomiting and hyperglycemia. R. at 582. Drs. Iman Al-Gadi and Kim Shams wrote, "[I.V.'s] high hemoglobin A1c suggests poor compliance with her insulin regimen" but that "[i]t is also possible that she may have an element of insulin resistance related to her [PCOS] or related to being generally poorly controlled over a long period." R. at 700. Dr. Melissa Crocker agreed that I.V. having had multiple admissions for DKA and being on very large doses of insulin "suggest noncompliance, although there is likely an element of insulin resistance both from her chronic hyperglycemia and possibly related to her PCOS." R. at 701.

In February 2013, I.V. was again admitted to Children's due to abdominal pain and nausea. R. at 591. Dr. Sarah Pitts thought polycystic ovarian syndrome ("PCOS") was a likely diagnosis, R. at 528, that was confirmed in July 2013, R. at 833. In February 2013, Nurse Rice wrote to Dr.

Pitts that while I.V. needs more insulin than one would expect for I.V.'s size, "there may be some insulin resistance going on in here especially as she is being evaluated for PCOS." R. at 647.

In August 2013, I.V. was admitted to Children's due to hyperglycemia, abdominal pain and vomiting. R. at 545. While I.V. responded appropriately to insulin, Dr. Erin Cicalese noted that it was imperative "to address any underlying reasons for [I.V.'s] difficulties with compliance such as depression, school anxiety, or lack of sense of control over her health to ensure she is able to live a full life and is able to complete her education." R. at 546.

In October 2013, Dr. Wolfsdorf noted again that he suspected I.V. was not taking all the prescribed doses of insulin and/or is unable to match her insulin doses with actual carbohydrates consumed, resulting in I.V.'s "persistently elevated blood glucose levels." R. at 641.

In January 2014, Dr. Sarah Pitts noted I.V.'s "diabetes control has been poor, she has been losing weight, and she has not been attending school." R. at 530. Dr. Pitts also noted that I.V. had "dysregulated sleep, mood order, and weight loss." R. at 532. I.V. said that when she does attend school, "she is tired and nearly falls asleep in class." Id.

In March 2014, I.V. told Dr. Pitts that "she does not like checking her sugars and giving herself insulin for every little thing," R. at 543, and that "her diagnosis is difficult for her to handle," R. at 544. I.V. said that she is not sure if she would want to put alarms on her phone to remind herself to check her sugars. Id.

In April 2014, I.V. was admitted to Children's due to abdominal pain and ketones in urine. R. at 577.

In July 2014, I.V. was admitted to Children's for labial and inner thigh abscesses and hyperglycemia. R. at 574.

In November 2014, I.V. was admitted to St. Elizabeth's Medical Center ("St. Elizabeth's") in DKA due to abdominal pain that had started a month prior but had worsened over the past two days. R. at 855-56. I.V. was diagnosed with massive hepatomegaly, or an enlarged liver. R. at 858, 868. An abdominal and pelvic CT scan, id., as well as an MRI, R. at 868, showed a mass in I.V.'s liver. A biopsy of I.V.'s liver was recommended. Id.

b) <u>Depression and Anxiety</u>

In January 2013, I.V. met with Dr. Jennifer Gentile and a psychology intern for a psychiatry evaluation consultation. R. at 755. They assessed I.V. and found that she had symptoms consistent with Major Depressive Disorder. R. at 758, 760. They noted that "there appears to be a cycle where [I.V.] feels sick, misses school, falls behind, feels sad/overwhelmed from falling behind, which increases her feelings of sickness and consequently, misses more school." R. at 758. Dr. Gentile also noted that I.V.'s "depressive symptoms and avoidance anxiety may play a strong role in her poor adherence resulting in decreased school attendance." R. at 760. Dr. Gentile recommended outpatient therapy "to help with adherence to diabetes regiment, return to school and to address depressive symptoms." R. at 759-60.

At the beginning of March 2013, I.V. met with Caitlin O'Reilly, a licensed independent clinical social worker. R. at 828. I.V. reported that since the start of 2013 she has felt "stressed, overwhelmed, and [has not been] doing the things she normally likes to do such as participate in school and spend time with friends." <u>Id.</u> I.V. also stated that "[s]he has little interest in being with friends or being active in school and expressed distress about having to 'go to a different room' at school and be separate from her peers." <u>Id.</u> She reported that "her grades have been dropping," and according to her mother, "has significant anxiety about having to stay back a year in school." <u>Id.</u> I.V. also told Ms. O'Reilly that she has problems both falling asleep and waking up. <u>Id.</u>

After her mental health evaluation, I.V. began attending The Boston Center ("TBC") starting from March 29, 2013 due to "worsening depressive symptoms related to complications with her diabetes diagnosis." R. at 509. Karimah Shah, licensed mental health counselor, recommended that I.V. receive an Individualized Education Plan ("IEP") and an expedited CORE evaluation[3] "to help determine the source of her difficulty with processing and focus," a reduced course load due to feeling "overwhelmed with the volume of work she has missed," a modified schedule "to help her grasp concepts that she may have missed" and a small group setting "to help manage her anxiety." Id.

In April 2013, I.V. met with Anna Stroman, a social work intern. R. at 826. In their first meeting, I.V. described her mood as being sometimes sad and that she sometimes cries when she feels that way. Id. Stroman described I.V.'s affect as "flat, exhibited by muted speech and little change in emotional expression." Id. I.V. noted that she does not like going to school and that going to school is overwhelming. Id. In subsequent sessions, Stroman described I.V.'s affect as "flat, exhibited by minimal conversation," R. at 824, or sad, R. at 818, even though I.V. described her mood as okay, R. at 824, as well as dysthymic, R. at 822. At times, I.V. would smile and become slightly more engaged in the conversation. R. at 824. I.V. stated that she does not want to be alone but feels better when alone. Id. She "typically spends her afternoons in her room alone" and "often eats dinner alone in her room." Id. I.V. noted that her younger sisters are unaware that she does not have the same father as them, which contributes to her depression. R. at 822. Stroman noticed that I.V.'s affect went from upbeat to more flat as discussion of school attendance increased. R. at 820. At one point, Stroman noted that I.V.'s depression "seems to be

---

[3] A CORE evaluation is a group of assessments that will help the school district determine whether a child has a disability that requires special education.

situational, as her consistent use of medication does not impact the fluctuation of her moods." R. at 773-74. I.V. consistently expressed anxiety around attending school and worried about asking questions in class. Id.; R. at 824. I.V. shared that she feels "nervous when walking into school" and that she feels anxious because "she needs to be in class when she is unsure of what is going on in terms of coursework." R. at 818. She also mentioned that "it makes her uncomfortable when other students are taking tests and she cannot." Id. I.V. also stated that she has a difficult time connecting to other patients at TBC. R. at 824.

In May 2013, during her first therapy session with Alaine Kiera Fredericksen, a licensed clinical social worker, I.V. exhibited a slightly anxious and guarded affect but still shared her fears about "going back to school, reconnecting with friends, and opening up to friends and family about her diabetes and related fears." R. at 816. In subsequent sessions, I.V. described her mood as "ok" and smiled occasionally, but seemed tired. R. at 814. She reported that going to school was difficult. Id. I.V. stated that while she wanted to pass and finish the year, she felt that she just wanted to give up many times. R. at 812. Fredericksen noted that I.V. "displayed low motivation and significant indecision" when discussing her future education plan and "exhibited a dysphoric affect and her speech was limited and soft in volume." Id.

In June 2013, I.V. told Fredericksen that her mood that day was good but that she felt weak and anxious the entire past week. R. at 810. She stated that she was having difficulty managing her diabetes and that she had missed an entire week of school. Id. I.V. also said she felt "overwhelmed when at school, specifically with falling behind in coursework and worrying about what other students think about her numerous absences." Id. Fredericksen noted that I.V. "exhibited a dysphoric affect." Id.

In July 2013, I.V. reported that her mood was a mix of happy and lacking emotion. R. at 808. She said that "her recent mood over the past few weeks [was] tired, 'grumpy,' and [lacking emotion]." Id. I.V. stated that she feels "fatigue from managing the diabetes over the past few years and a lack of hope for ever having it under control." Id. She also stated that "she is worried about starting school again in September." Id. Fredericksen noted that I.V.'s affect continues to be dysphoric and slightly guarded. Id.

In August 2013, I.V. reported that her mood was better than last time but that she felt "anxious about returning to school in a few weeks and would like to work on ways to reduce the anxiety." R. at 806. She also stated that "she was feeling less sad, less isolated, and was more engaged with talking to friends on the phone, watching movies and laughing more." Id. Fredericksen noted that I.V. smiled more and appeared to have more energy as well as was open to sharing her feelings even though "her affect was still primarily flat." Id.

In October 2013, I.V. completed a depression screening tool for adolescents ("CES-DC") with Rein. R. at 796. On the CES-DC, I.V.'s scored was "elevated and significant" for depression. Id. During the meeting, I.V. stated that "when she is feeling sad or lonely, she fails to care for her diabetes" and that when "her blood sugars are elevated, she often feels depressed and unmotivated to care for herself." Id. Rein believed that I.V.'s struggle with managing her diabetes were "clearly related to her mental health." Id.

In November 2013, Stroman noted that I.V.'s affect appeared "flat, exhibited by minimal engagement in session and minimal eye contact." R. at 791. I.V. stated that she was "losing motivation and in turn doing worse in school causing her more upset" and that "her lack of motivation is what is most upsetting to her at this time." Id. I.V. wished she were normal in that she did not have to take medication daily to function. R. at 789. Although I.V. questioned whether

Prozac worked, she resumed taking it in December 2013, R. at 789, after stopping in November 2013, R. at 791.

In February 2014, I.V. completed another CES-DC, again receiving an "elevated and significant" score for depression. R. at 781. Rein noted that "addressing [her] underlying depression will help improve [her] motivation to improve her diabetes habits," since when [I.V.] attends therapy, she seems to feel better." Id. Dr. Wolfsdorf noted that I.V. leaves school early on some days "because she does not feel well enough or is too depressed to attend a full day." R. at 632.

From February 2014, I.V.'s affect was overall "within normal limits," R. at 761-79, and euthymic, R. at 775. During this time, I.V. was concerned about her school attendance. R. at 767. She noted that she had meetings with her high school advisors about attending "the Day and Evening Program in order to graduate next spring." R. at 765. I.V. stated that "this has caused her some stress in that she thinks she is failing herself and who she 'should' be," but that she thinks "this may be a good option for her as long as it helps her to graduate in one year." Id. I.V. had to withdraw from her summer college prep course due to poor attendance. R. at 763. I.V. stated that "she has been very tired and is not sleeping well which interrupts her insulin administration and her ability to do school work and spend time with family and friends." Id.

2.    *ALJ Hearing*

At the October 28, 2014 hearing,[4] the ALJ heard testimony from I.V. and her mother, Ingrid Vargas Delacruz ("Delacruz").

a)    <u>I.V.'s Testimony</u>

I.V. lives with her mother and two younger sisters.  R. at 62.  She is alone at home until her mother comes home in the afternoon.  R. at 66.  When her sisters come home from school, they check on her to see how she is doing.  R. at 64.  When I.V. is home by herself, she mainly lies down and eats small meals because of her stomach pain.  R. at 67.

On bad days, she lies in bed and is unable to get out of bed because she is tired, sad and lacks motivation.  R. at 55-56.  Her mother has to give her insulin and make her eat.  R. at 55. High blood sugar makes her feel dehydrated and gives her headaches.  R. at 56.  She has trouble standing up and focusing.  <u>Id.</u>  I.V. has aches and pains as a result of diabetes.  <u>Id.</u>  On good days, she checks her blood sugar level four to six times.  <u>Id.</u>  On bad days, she has to constantly check her blood sugar level.  <u>Id.</u>

I.V.'s diabetes make her feel hopeless and she has trouble coping, which causes her to keep her distance from others and lose any bond with others.  R. at 57.  She is not as social as she used to be and has few friends.  <u>Id.</u>  She barely talks to her friends.  R. at 65.  I.V. has a hard time socializing and opening up to others because she tends to stay to herself.  R. at 62.

I.V. has missed a lot of school because she has been feeling sick, R. at 58, and lousy as a result of diabetes, R. at 65.  She has only attended a couple of weeks of school for her senior year. R. at 61.  Missing school makes her depressed, which results in her sleeping throughout the day.

---

[4] The Court notes that no evidence was taken at the first ALJ hearing on January 30, 2014.  R. 41-47.  Once I.V. and her mother indicated that they wanted to get counsel, the ALJ continued the hearing.  <u>Id.</u>

R. at 58.  The thought of going back to school scares her because she will not be able to catch up to the other students.  Id.  This fear gives her panic attacks, id., and anxiety, R. at 65.  I.V. wants to graduate high school and become an early child education teacher.  R. at 58.  The school has been sending her homework, which she has been trying to complete.  R. at 60.  I.V. has also been trying to get a tutor, but it is difficult to do so.  R. at 66.

I.V. has been to the doctor at Children's and St. Elizabeth's more than five times in the last few months.  R. at 58-59.  She has been to the emergency room due to stomach pain, bloating, dehydration and ketones.  R. at 59.  Going to the hospital all the time makes her angry and frustrated, so she tries not to go even though it will help her feel better.  Id.

b)      Mother's Testimony

Delacruz testified that she has to check I.V.'s blood sugar level every three hours when I.V.'s blood sugar level is high and she has ketones.  R. at 68.  She has to give I.V. insulin three days out of the week because I.V. will not do it herself when she is depressed or having a bad day.  R. at 72.  She stated that I.V. has been very down and unmotivated over the last month.  R. at 68.  She elaborated that I.V. has stopped socializing and hanging out with her friends.  Id.  Delacruz stated that I.V. stays home sleeping when I.V. is agitated and when her blood sugar level is high or when she is complaining about stomach pain because she does not want to go to school.  Id.  When I.V.'s blood sugar level is high, she closes herself off from everybody.  R. at 70.  This has affected I.V.'s relationship with her sisters because she does not want to interact with them.  R. at 71.

Delacruz testified that I.V. has about three good days a week.  R. at 70.  When I.V.'s blood sugar level is stable, I.V. is motivated and happy.  Id.  I.V. hangs out with friends and her sisters, and is interested in things.  Id.

When I.V. goes to school, the school nurse will check her blood sugar level. R. at 69. If I.V.'s blood sugar level is high, the nurse will contact the educator nurse at Children's who will contact Delacruz to bring I.V. to the emergency room. Id. Delacruz stated that she has had to bring I.V. to the emergency room five times since the tenth grade. Id.

Delacruz testified that she has been communicating with I.V.'s guidance counselor about plans for I.V. to finish her senior year. Id. These plans include having I.V. attend classes in the afternoon or evening, since I.V.'s blood sugar level starts to stabilize in the afternoon, and having teachers drop off her homework. R. at 69-70.

Delacruz stated that in the last month, I.V. has had appointments with doctors for diabetes and stomach pain as well as an appointment with a therapist for depression. R. at 70-71. She said that I.V. was seeing a therapist, Anna Stroman, and that I.V. will start seeing a therapist at Alston Brighton Clinic for depression. R. at 72-73.

### 3. Findings of the ALJ

Following the three-step protocol, 20 C.F.R. § 416.924(a), at step one, the ALJ found that I.V. had not engaged in substantial gainful activity since June 15, 2012, the date of application for SSI benefits. R. at 19. I.V. does not dispute the ALJ's finding at step one.

At step two, the ALJ found that I.V. had the severe impairments of "type 1 diabetes mellitus; gastroesophageal reflux disease; depression; and anxiety." Id. I.V. does not dispute the ALJ's findings at step two.

At step three, the ALJ found that I.V.'s impairment or combination of impairments did not meet or medically equal the severity of one of the listings in Appendix 1. Id. The ALJ considered Listing 109.00 (Endocrine System), 112.04 (Mood Disorders), 112.06 (Anxiety Disorders). Id.;

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 109.00, 112.04, 112.06.  The ALJ found that I.V. did not meet the standard for any of these listed impairments.  R. at 19.

The ALJ then considered whether I.V. had an impairment or combination of impairments that functionally equaled the severity of the listings.  R. at 19-20.  The ALJ considered I.V.'s limitations under each of the domains and determined that even though I.V.'s impairments could reasonably be expected to produce the symptoms that I.V. was alleging, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  R. at 28.

The ALJ determined that I.V. had "less than marked" limitations in acquiring and using information, R. at 30-31, in attending and completing tasks, R. at 31, in interacting and relating with others, R. at 32, in moving about and manipulating objects, R. at 33, and in caring for herself, R. at 33-34.  The ALJ found that I.V. had a "marked" limitation in health and physical well-being. R. at 34-35.  Because I.V. did not have two "marked" or one "extreme" limitation in the domains, the ALJ concluded that I.V. was not disabled as defined in the Social Security Act.  R. at 35.  I.V. argues that the ALJ erred in failing to determine that her impairment or combination of impairments functionally equal the severity of the Listings.  D. 14 at 13-22.

C.    **I.V.'s Challenges to the ALJ's Findings**

I.V. claims that the ALJ erred in denying her claim because the ALJ's decision is not supported by substantial evidence and is based upon several errors of law in that the ALJ:  (1) failed to perform a complete and correct analysis under the domain of health and physical well-being, which led him to err in finding I.V. suffered from a "marked" instead of an "extreme" limitation in this domain, due to summarizing selectively I.V.'s medical and school records and failing to give due weight to objective reports and medical evidence from I.V.'s treating sources;

(2) summarized selectively the record and failed to give due weight to I.V.'s treating sources to support a finding that I.V. suffered from a "less than marked" limitation in caring for herself rather than a "marked" limitation; and (3) ignored medical evidence from I.V.'s treating sources and, in the absence of a medical expert, departed from two prior SSA findings that I.V. suffered from a "marked" limitation in interacting and relating with others.  D. 14-1 at 13-20.

1.  *The ALJ erred in failing to provide the weight given to the opinions of I.V.'s treating physicians*

I.V. argues that the ALJ erred in failing to give weight to opinions from treating sources because "the ALJ ignored her treating physicians' statements," D. 14-1 at 15, and "ignored medical evidence from treating sources," id. at 19.  The Commissioner counters that there were no such errors in the ALJ's evaluation of the medical opinions in the record.  D. 18 at 12-15.

In determining that the severity of I.V.'s impairments does not meet or medically equal the severity requirements of any impairment listed in Appendix 1, the ALJ stated that he "considered the opinions of the state agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion." R. at 19.  Later in his opinion, the ALJ provides his reasoning for the weight given to the assessments of Dr. Doraiswami and Dr. Jao, advising physicians to the DDS.  R. at 28.  The ALJ, however, failed to give appropriate weight to I.V.'s treating physicians.

Generally, the ALJ must give controlling weight to a treating physician's opinion "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the patient's medical condition.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The ALJ, however, is not required to accept automatically the conclusions of the treating physicians.  Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998).  The ALJ gives controlling weight to the opinion of the claimant's treating physicians only if the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)); Green v. Astrue, 588 F. Supp. 2d 147, 154 (D. Mass. 2008).

If the ALJ finds that the treating physicians' opinions should not be given controlling weight, she must assess the relevant factors as outlined in 20 C.F.R. §§ 416.927(c)(2)-(c)(6)[5] and provide "good reasons" for the weight given.  20 C.F.R. § 416.927(c)(2).  The regulations do not require the ALJ to list the six factors or expressly state how he considered each factor.  Bourinot, 95 F. Supp. 3d at 177 (quoting 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)).  An "ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  Ramos-Birola v. Astrue, No. 10–cv–12275–DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (quoting N.L.R.B. v. Beverly Enters.–Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (internal quotation marks omitted)).

Failure to provide "good reasons" may constitute reversible error.  For example, in Burrell v. Berryhill, No. 16–3480–MTM, 2017 WL 714116, at *5 (N.D. Ill. Feb. 23, 2017), the court found that the ALJ had committed reversible error for not giving "good reasons" for rejecting a treating source's medical opinion where the ALJ failed to minimally address many of the enumerated factors provided in 20 C.F.R. § 404.1527.  Id.  Here, the ALJ failed not only to provide "good

---

[5] The six factors that must be considered are: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinions reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion.  See 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927(c)(2)-(c)(6).

reasons," but failed to provide any reasons for the weight given to the opinions of I.V.'s treating physicians. Accordingly, the Court cannot determine what weight was given to the opinions of I.V.'s treating physicians.

The lack of such reference makes it "impossible to determine whether [the ALJ] merely discredited that assessment or, in fact, overlooked that piece of psychological evidence most supportive of Mr. Nguyen's claim." Nguyen v. Callahan, 997 F. Supp. 179, 182 (D. Mass. 1998). Similarly, here, the ALJ did not mention the opinions of I.V.'s treating physicians that could support I.V.'s claim, such as the possibility that I.V. may have become insulin resistant. R. at 545, 647, 700, 701; Crosby v. Heckler, 638 F. Supp. 383, 385 (D. Mass. 1985) (citing Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981) (stating that "[t]he ALJ cannot reject evidence for no reason, or for the wrong reason, and must explain the basis for his findings"). As a result, it impossible to determine whether the ALJ merely discredited those opinions or overlooked those pieces of evidence.

The Commissioner cites Crespo v. Astrue, No. 08–10846–DPW, 2009 WL 1459691, at *5-6 (D. Mass. May 26, 2009), to support the contention that the ALJ was entitled to draw conclusions based on the record as a whole. Id. While the ALJ is entitled to draw conclusions based on the record as a whole, Crespo does not apply here. In Crespo, there was contradictory evidence from a nonexamining source that went against the majority of the evidence. Id. at *5. However, in this case, there is contradictory evidence from examining sources. While the ALJ is entitled "to resolve the conflict by differentially according more weight to certain evidence," id. (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)), here, there is no indication as to the weight given to the relevant evidence from I.V.'s treating physicians. It is therefore difficult to say that the ALJ considered the record as a whole. See Nguyen, 997 F.

Supp. at 182; <u>Graves v. Colvin</u>, No. CV 14-14756-MGM, 2016 WL 270382, at *7 (D. Mass. Jan. 21, 2016) (stating "without more adequate explanation, the court cannot determine whether the ALJ properly evaluated these treating source opinions").

Without knowing whether the ALJ properly considered the opinions of I.V.'s treating physicians, the Court is unable to determine whether such consideration would have changed the ALJ's ultimate disability conclusion. <u>See Graves</u>, 2016 WL 270382, at *7. Accordingly, it is necessary to remand the matter to the ALJ to indicate explicitly the weight accorded to the opinions of I.V.'s treating physicians. <u>See Seavey v. Barnhart</u>, 276 F.3d 1, 12 (1st Cir. 2001) (stating "[w]hen an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency"); <u>see also Burrell v. Berryhill</u>, No. 16 CV 3480, 2017 WL 714116, at *5 (N.D. Ill. Feb. 23, 2017) (holding that "[w]ithout the requisite 'good reasons'" to reject treating physician's opinion, "the ALJ committed reversible error, which requires remand").

2. *The ALJ erred in failing to consider I.V.'s impairments in combination when considering whether I.V.'s impairments functionally equaled the severity of a listing in Appendix 1*

I.V. argues that the ALJ erred by summarizing selectively the record to support his finding of no disability. D. 14-1 at 13. In particular, I.V. points to portions of the ALJ's decision that ignore the combined or cumulative effects of her limitations, thereby failing to find that she was disabled on the basis of substantial evidence. D. 14-1 at 14-20.

At step three of the evaluation to determine whether a child under the age of 18 is disabled, the ALJ must determine if a child claimant has a severe impairment or combination of impairments that medically or functionally equals a listing in Appendix 1. 20 C.F.R. § 416.924(a). If a child

has a "marked" limitation in two domains, or an "extreme" limitation in one domain, then the ALJ must find the child to be disabled. 20 C.F.R. §§ 416.926a(a), (c), (e).

Here, the ALJ determined that I.V. had "less than marked" limitations in acquiring and using information, R. at 30-31, in attending and completing tasks, R. at 31, in interacting and relating with others, R. at 32, in moving about and manipulating objects, R. at 33, and in caring for herself, R. at 33-34. The ALJ found that I.V. had a "marked" limitation in health and physical well-being. R. at 34-35. Because I.V. did not have two "marked" or one "extreme" limitation, the ALJ concluded that I.V. was not disabled as defined in the Social Security Act. R. at 35.

In determining whether a claimant's impairment or combination of impairments functionally equal the severity of a listing in Appendix 1, the ALJ must consider the combined effect and combined impact of all of the individual's impairments. 20 C.F.R. § 416.926a(a); see Nieves v. Sec'y of Health & Human Servs., 775 F.2d 12, 14 (1st Cir. 1985) (reversing district court and finding claimant was entitled to benefits because claimant became unable to continue working after developing a physical impairment, which in combination with her preexisting mental impairment significantly limited her work-related functions). There is no clear indication that the ALJ looked at the combined effect of all of I.V.'s impairments. The ALJ explicitly considered I.V.'s mental impairments and I.V.'s physical impairments, but did not consider these impairments in combination. For example, it does not appear that the ALJ considered how I.V.'s mental impairment (depression) could affect I.V.'s compliance with her diabetes management program. At the times of I.V.'s poor compliance with her prescribed insulin regimen, there is evidence that she was struggling with depression, R. at 55-57, 68-72, 546, and that she may have had insulin

resistance, R. at 647, 700, 701. The ALJ failed to explain his analysis reconciling these issues.[6]

The ALJ also did not appear to consider other evidence in the record relating to consideration of I.V.'s limitations in combination. See, e.g., R. at 645 (Dr. Wolfsdorf stating I.V. "missed innumerable school days owing to hyperglycemia, ketonemia, anxiety and depression"), 758 (Dr. Gentile observing a "cycle where [I.V.] feels sick, misses school, falls behind, feels sad/overwhelmed from falling behind, which increases her feelings of sickness and consequently, misses more school"). It is unclear from the ALJ's decision whether he considered any combination of I.V.'s impairments in determining whether I.V. is disabled. See, e.g., 20 C.F.R. § 416.926a(k)(3) (listing "refusal to take your medication" as an example of self-injurious behavior that could indicated a marked or extreme limitation); 20 C.F.R. § 416.924a(h)(7)(v) (listing "[a]ttendance and participation" as a relevant factor in determine whether a school-attending child has a disability and that if the child has "more than one impairment, we will look at whether the effects of your impairments taken together make you unable to participate on a regular basis").

Here, for one example, while the ALJ did identify I.V.'s severe impairments of gastroesophageal reflux disease and anxiety, R. at 19, he did not consider their interactive effects in his assessment. In addition, while he did rely to some extent on the assessments of Dr. Doraiswami and Dr. Jao, R. at 28, they only evaluated I.V. on the basis of diabetes mellitus, and did not list or consider any of her other impairments, R. at 78-83, 89-97. In sum, the ALJ did not "demonstrat[e] [his] awareness of the requirement to consider the combined effect of Plaintiff's impairments" or point to any evidence in the record that physicians or other appropriate medical

---

[6] Further, the ALJ discounted I.V.'s limitations because she "frequently struggled to comply with her prescribed course of management, and most – if not all – of her episodes of diabetic exacerbation have occurred in the setting of questionable compliance." R. at 29. Non-compliance, however, may be excused for good cause. Alcantara v. Astrue, 257 F. App'x 333, 335 (1st Cir. 2007).

experts had "determined that none of the claimant's impairments, either singularly or in combination, are medically equivalent to any listed impairments." Viveiros v. Astrue, No. 06-419T, 2009 WL 196217, at *5 (D.R.I. Jan. 23, 2009). While the ALJ notes that I.V. does not have an "impairment or combination of impairments," R. at 19, 35, his analysis of her limitations with respect to the six functional equivalence domains considers limitations in isolation, making no reference to combinations of limitations, see R. at 19-35. More than this bare mention of combination of impairments is required to affirm an ALJ's ruling. See, e.g., Lyons ex rel. X.M.K.L. v. Astrue, No. 12-30013-KPN, 2012 WL 5899326, at *5 (D. Mass. Nov. 26, 2012) (noting as additional basis for remand that ALJ "did not explain why motivational or behavioral problems, apparently caused by [plaintiff's] medical impairments, would not have an impact on the domain of acquiring or using information").

Gordils v. Sec'y of Health and Human Servs., 921 F.2d 327 (1st Cir. 1990), does not dictate another outcome here. First, unlike Gordils, the medical records in this case do not lead to one conclusion that the ALJ can draw through common sense. See id. at 329-30. This is not a case where the accumulation of evidence points to a single and obvious conclusion that is merely unstated.

The Court concludes that the ALJ's decision is not supported by substantial evidence. In deciding whether I.V.'s impairments functionally meet or equal a listing in Appendix 1, the ALJ was required to "assess the interactive and cumulative effects" of all of I.V.'s impairments. 20 C.F.R. § 416.926a(a). Accordingly, remand is warranted here since the Court cannot say the error here was harmless. Randolph, 2017 WL 770148, at *6 (finding ALJ's error not harmless where he failed to assess the interactive and cumulative effects of all of claimant's impairments) (citation and internal quotation marks omitted).

On remand, the ALJ shall consider the interactive and cumulative effects of I.V.'s impairments in combination when considering whether I.V.'s impairments functionally equal the severity of a listing in Appendix 1.

**V.     Conclusion**

Based on the foregoing, the Commissioner's motion to affirm, D. 18, is DENIED and I.V.'s motion to remand, D. 14, is ALLOWED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge